COMMONWEALTH *vs.* JOHN F. MASELLO.

Essex. September 9, 1998. - December 9, 1998.

Present: WILKINS, C.J., ABRAMS, GREANEY, FRIED, & MARSHALL, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Argument by prosecutor, Capital case. *Evidence,* Inference.

The evidence at the trial of an indictment for murder in the first degree did not demonstrate adequate provocation to warrant an instruction to the jury on voluntary manslaughter, and the judge was correct in refusing to give the instruction. [448-450]

At the trial of a murder indictment, the prosecutor's argument to the jury was consistent with the evidence, including reasonable inferences; also, his attribution of vengefulness to the defendant, while inappropriate and improper, was not unduly prejudicial in light of the strong case against the defendant and the judge's instructions to the jury. [450-454]

INDICTMENT found and returned in the Superior Court Department on June 29, 1994.

The case was tried before *Howard J. Whitehead,* J.

*Dana Alan Curhan* for the defendant.

*Adam Bookbinder,* Assistant District Attorney (*Gerald P. Shea,* Assistant District Attorney, with him) for the Commonwealth.

MARSHALL, J. On November 14, 1995, the defendant was convicted by a jury of the crime of murder in the first degree (G. L. c. 265, § 1) on the theory of deliberate premeditation. The victim was his twenty-four year old girl friend. The cause of death was a wound to the left side of her head from a gun fired at close range. The defense was that the gun had discharged accidentally.

Represented by new counsel on appeal, the defendant claims that the judge erred in failing to instruct the jury on manslaughter as a lesser included offense, despite his trial counsel's express request that the jury be instructed on the two degrees of murder only. He also contends that inferences argued by the prosecutor in his closing argument were not supported by the evidence and

were so prejudicial as to require a new trial. We affirm the conviction, and see no reason to grant any relief under G. L. c. 278, § 33E.

1. The jury permissibly could have found the following facts. The defendant first met the victim when he was twenty and she was fourteen years old. Over the ensuing ten years, they had a tumultuous, on-again-off-again relationship. The couple moved into an apartment together in April, 1994. On the evening of June 25, 1994, the defendant and the victim attended a festival in Gloucester. During the course of the evening they both consumed alcohol, and at some point they began to argue. They returned home. A neighbor heard them arguing before they entered their building, and heard the argument escalate over the next several hours. He could hear the couple clearly. Later that night, the victim spoke to her mother on three separate occasions, using a telephone in the kitchen. During the first and last conversations, the victim's mother could also hear the defendant; the victim informed her that the speaker of the telephone extension in the bedroom was activated. Neither the victim's mother nor the neighbor heard the victim or the defendant mention suicide or a gun.

The victim's mother and neighbor both heard, but could not see, the last moments of the victim's life. Shortly before she was shot, the victim had agreed to leave the apartment with her mother, who had said she would come within forty-five minutes. The defendant was aware that the victim had decided to leave that night. The victim's mother then heard a bang, which the neighbor also heard; both believed that it was a gunshot. For ten to fifteen seconds before she heard the shot, the victim's mother was listening to her daughter on the telephone but could no longer hear any sounds from the defendant. Immediately after hearing the shot, the mother heard a thump, the sound of the telephone dropping, and the defendant yelling to call an ambulance. The defendant ran onto the apartment balcony, and the neighbor heard him shouting: "I shot her. I shot her. Somebody call the ambulance."

Two police officers reached the scene a few minutes later. They broke down the apartment door and found the defendant kneeling over the body of the victim, repeating, "Breathe, breathe. I'm sorry, I'm sorry." The victim was still breathing, but had no pulse. The officers recovered a revolver approximately three feet from the victim's body. An ambulance took the victim to a hospital, where she died.

The defendant gave several statements to the police, after receiving Miranda warnings and waiving his rights on each occasion. The defendant told police officers that immediately before the shooting, the victim had been holding the gun and threatening to kill herself. He said he approached her, demanding that she put the gun down, then tackled her in an attempt to take the gun away. As they fell to the ground, he said, he seized the gun but accidentally depressed the trigger, shooting the victim in the head. The defendant gave conflicting reports about the location of the gun before the argument began, and could not account for how or when the victim had obtained it. He also told the officers that he and the victim had been arguing furiously, and that when they arrived at the apartment, the victim started "throwing punches" and "screaming" at him. The gun was fired less than three to six inches from the victim's left temple, at an upward angle. The victim was right-handed. No physical evidence supported the defendant's contention that the victim had been holding the gun.

2. During a conference at the close of the evidence, the defendant's trial counsel requested that the judge instruct the jury on the degrees of murder only.[1] The prosecutor concurred, stating that in his view the evidence would not support a manslaughter conviction. The judge agreed, and instructed the jury on murder in the first degree on the theory of deliberate premeditation and on murder in the second degree.[2] Relying on *Commonwealth* v. *Nardone*, 406 Mass. 123 (1989), the defendant now claims that the evidence would have supported a conviction of manslaughter had the jurors found that the unlawful killing "arose from the frailty of human nature, as in instances of sudden passion induced by reasonable provocation [or] sudden combat," *id*. at 130-131, and that, despite the defendant's request to the contrary, the judge should have instructed on manslaughter.

We infer in this case that the judge did not give an instruction

---

[1]The judge inquired of counsel, "How many variations of homicide should be presented to the jury?" Defense counsel replied: "Your Honor, as far as the defendant is concerned, neither one. . . . You have to give the second-degree instruction. Other than that, we aren't requesting any further instructions." Defense counsel did not explain why he sought no other homicide instruction.

[2]The prosecutor informed the judge: "I don't think the evidence fairly suggests manslaughter." The judge responded: "Both sides having requested that I give just murder one and murder two, that's what I will do. By the way, I don't think that that is an unreasonable position for either side to take."

on manslaughter at least in part because he agreed with the prosecutor that the evidence did not support it.[3] We agree with that assessment of the evidence. "A jury instruction on voluntary manslaughter is warranted 'if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' " *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 514 (1997), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). In deciding whether the evidence might have supported a manslaughter instruction, we draw all reasonable inferences in the defendant's favor, *Commonwealth* v. *Nichypor*, 419 Mass. 209, 216 (1994), citing *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 746 (1975).

The defendant recognizes that a heated oral argument that escalated during the course of the evening, without more, does not constitute adequate provocation. See *Commonwealth* v. *Seabrooks, supra* at 514-515. See also *Commonwealth* v. *Carrion*, 407 Mass. 263, 267 (1990); *Commonwealth* v. *Callahan*, 401 Mass. 627, 632 (1988), quoting *Commonwealth* v. *Zukoski*, 370 Mass. 23, 28 (1976) ("[i]nsults and quarreling alone cannot provide a reasonable provocation"). To support his theory of provocation, he points to evidence of a physical struggle with the victim, noting that there was disarray in the apartment and that the victim had been "throwing punches" at him.[4] He adds that the jury could have found, as the prosecutor had argued, that the defendant "had no control over his temper" and that he acted "in a rage at the time of the shooting." The intensity and the duration of the argument, he claims, warranted a voluntary manslaughter instruction. We disagree. Even if we "treat[] the defendant's story, regardless of its credibility, as if it were entirely true," *Commonwealth* v. *Brown*, 387 Mass. 220, 227 (1982), his story does not recount provocation adequate in law

---

[3]See note 2, *supra*. Earlier, in denying the defendant's motion for a required finding of not guilty, the judge stated: "I think that the evidence is sufficient to permit the jury to consider both a charge of murder in the first degree and a charge of murder in the second degree. So, I will deny the motion for a required finding."

[4]The defendant also told a police officer that at some point the victim "started pounding him with her fists" and that she had been "throwing whacks at [him] and started screaming."

to warrant a voluntary manslaughter instruction. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 629 (1994); *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980).

Here there was scant evidence that the victim had attacked the defendant or struck any blows,[5] and there is no evidence that any punches thrown by the victim caused the defendant to attack the victim. See *Commonwealth* v. *Curtis, supra* at 629 n.6 ("[e]ven when the victim strikes a blow, a heat of passion voluntary manslaughter instruction is not always required"); *Commonwealth* v. *Garabedian*, 399 Mass. 304, 314 (1987); *Commonwealth* v. *Brown, supra* at 227 (evidence that victim choked husband with shirt insufficient to require manslaughter instruction when husband had stabbed her twenty-seven times); *Commonwealth* v. *Zukoski*, 370 Mass. 23, 29 (1976) (victim throwing glass at defendant not reasonable provocation to trigger his kicking her to death, especially since threat from thrown glass had passed); *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973) (suggestion that scratches inflicted on defendant by his wife could serve as provocation for ferocious yet "malice-free" attack by defendant with deadly instrument was "extravagant").

Moreover, as the defendant described the events, there was more than sufficient time for the defendant to "cool off" between his alleged physical confrontation with the victim and the time that the victim was shot. See *Commonwealth* v. *Coleman*, 366 Mass. 705, 707-708, 715 (1975). In his statements to the police, the defendant said that the victim had been "throwing punches" at him before he initiated the first telephone call to the victim's mother. That call occurred several hours before the killing. He also said he went into the bedroom and listened "for a while" to the last conversation before returning to the kitchen. The judge was entirely correct to conclude that the evidence did not support a manslaughter instruction.

3. The defendant argues that the prosecutor's closing argument was improper because he used inferences, not supported

---

[5]The defendant argues that the jury "could very well have found" that the victim initiated the physical confrontation described by the defendant. Even if initiated by the victim, the physical confrontation that he described took place several hours before the shooting. The disarray in the apartment and the "clump of hair" that had been ripped from the victim's head is evidence of a physical struggle between the defendant and the victim, but does not point to any provocation by the victim.

by the evidence, that were prejudicial to the defendant.[6] The portion of the prosecutor's closing argument to which the defendant objects was a narration of the minutes preceding the shooting:

> "So, he went into the bedroom in a rage, I suggest to you, but with that focus.
>
> " 'You want to leave? You'll leave. But you'll leave on your back.' And he got that gun, in that rage, in that anger, with the intention of killing [the victim], because look at this: He went first into the bedroom; he pulled this loaded gun out of the holster; he walked back into the kitchen; he pointed it at her head; three inches away, he pulled the trigger. His intention could not have been anything else. It was not accidental. It was not in [the victim's] hand. It was an execution. He did it on purpose. He thought about it before he did it."[7]

The defendant argues that there was no evidence proving that the defendant had left the kitchen to retrieve a gun from the bedroom, or that he had returned to the kitchen with a loaded gun. Arguments that are unsupported by the evidence are improper, *Commonwealth* v. *Connor*, 392 Mass. 838, 853 (1984); however, the inferences that the prosecutor drew of the defendant's actions immediately before the shooting were not inappropriate. The defendant's story was that the victim had held the gun and threatened to shoot herself, and that he had attempted to wrestle the gun from her. But the prosecutor's story was consistent with a different view of the evidence. See *Commonwealth* v. *Haskins*, 411 Mass. 120, 121 (1991); *Commonwealth* v. *Travis*, 408 Mass. 1, 11-12 (1990). The defendant told the police that he kept the loaded gun in the bedroom. He said that he sometimes cleaned his gun in the kitchen, but that

---

[6]Following the prosecutor's closing argument, the defendant moved for a mistrial on the grounds that the inferences the prosecutor drew were not supported by the evidence and were inflammatory.

[7]Earlier in his closing statement the prosecutor had argued:

"I suggest to you that the evidence builds and increases in intensity until that point, just before 3 A.M. when he went into the other room, and he picked up his gun, and he walked back into the kitchen, with the intention of shooting [the victim]. And, without a word, he silently walked into that kitchen, raised the gun, and shot her in the head."

the gun was always unloaded when he cleaned it. He gave conflicting statements about when he had last cleaned the gun,[8] and he could not explain why the loaded gun might have been left in the kitchen, or how the victim came to possess the weapon. There was no physical evidence linking the victim to the gun, and neither the victim's mother nor the neighbor heard the victim speak of a gun or of killing herself. For ten to fifteen seconds immediately preceding the shooting, the victim's mother no longer could hear the defendant. The evidence was adequate to support an inference that, immediately before the shooting, the defendant had retrieved the loaded gun from the bedroom.[9]

The prosecutor's suggestion that, prior to the shooting, the defendant had been thinking: "You want to leave? You'll leave. But you'll leave on your back," is argument of a different order. There was no testimony at trial that this was the defendant's state of mind. Nor is it the kind of "enthusiastic rhetoric" that we have tolerated. *Commonwealth* v. *Wilson*, 427 Mass. 336, 350 (1998). It was entirely unnecessary: the Commonwealth's case against the defendant was strong, and the evidence before the jury, together with the prosecutor's reasonable inferences, if accepted, was sufficient to establish murder in the first degree. The statement should not have been made.

. The vengeful sentiment attributed by the prosecutor to the defendant nevertheless may not be unduly prejudicial if cured by adequate instructions to the jury. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997); *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993). Cf. *Commonwealth* v. *Shelley*, 374 Mass. 466, 470-471 (1978). While he did not comment on the specific objections raised by defense counsel, the judge did tell the jury more than once that counsels' closing arguments were not evidence, and that the jury were to test the arguments against their own recollection of the evidence.[10] We may rely on the jury's ability to distinguish hyperbole, and their attention to

---

[8]After the defendant had made at least four statements to the police about the gun, he said he then recalled that he had taken it out to polish it on the afternoon before the shooting. He did not say that he had left the gun in the kitchen.

[9]In denying the defendant's motion for a new trial, the judge also concluded that the evidence supported a "reasonable inference" that the defendant had walked into the bedroom and then returned with a gun.

[10]The judge addressed the subject several times. Before the evidence was presented, he told the jury:

the judge's instructions, to cure otherwise prejudicial errors in arguments. *Commonwealth* v. *Santiago, supra* at 495. See *Commonwealth* v. *Wilson, supra* at 350 (jury is assumed to have a "certain measure of sophistication"). Curative instructions have insulated far more egregious imaginary sentiments and appeals to jury sympathy from reversible error. See, e.g., *Commonwealth* v. *McColl,* 375 Mass. 316, 324-325 (1978) (prosecutor outlines imaginary conversation between defense counsel and defendant about construction of insanity defense). Cf. *Commonwealth* v. *Santiago, supra* at 494, 501, 503 (repeated references to homicide victim's age and pregnant status would not have been reversible given stronger Commonwealth case and more specific curative instructions).

We view with disfavor unnecessary and hyperbolic embellishments in prosecutorial closing arguments. We expect prosecutors to present their closing arguments on the basis of the evidence presented, and reasonable inferences drawn from that evidence. Evaluating whether an improper statement was prejudicial to a defendant, when we have access to a written transcript only, is a difficult task that need not occur if counsel adhere to our clear guidelines on this subject. The Commonwealth's prosecutors should avoid engaging in inappropriate rhetoric that requires us to undertake this kind of analysis. In this case we are confident, in light of the strength of the Commonwealth's case against the defendant[11] and the instructions of the judge, that the isolated improper statement by the

"The closing arguments are an opportunity for the attorneys to marshal the evidence, to put it together, to summarize it which, they hope, will be persuasive to you of their particular side's point of view. Keep in mind though, again, and I will mention this at the time of closing: When you hear a closing, the attorneys are not witnesses; they are not able to add any facts beyond that which is supported by the evidence."

He gave similar instructions following the presentation of the evidence, and before closing arguments were made. On that occasion, he admonished the jury: "[W]hen you hear the summary of the evidence, from the attorneys, it is just a summary of the evidence. The attorneys are not witnesses. And if they unintentionally add a fact that is not supported by the evidence, you should disregard that fact." He repeated the instructions after the closing argument and after defense counsel's objection to the prosecutor's closing argument.

[11]The defendant argues that the evidence against him was "far from overwhelming" because, he claims, he told the police from the outset that the shooting was accidental. We disagree. Two witnesses — the victim's mother and the neighbor — overheard the last minutes before the victim was shot. Both testified that the statements the defendant attributed to the victim about

prosecutor was not unduly prejudicial. See *Commonwealth* v. *Bush,* 427 Mass. 26, 30 (1998), citing *Commonwealth* v. *Nadworny,* 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986); *Commonwealth* v. *Beckett,* 373 Mass. 329, 341 (1977).

4. The defendant asks that we reduce or reverse the verdict pursuant to G. L. c. 278, § 33E. He suggests that the jury may have been reluctant to acquit him in view of the compelling evidence against him, but had no option to find him guilty of manslaughter. He argues that his consumption of alcohol on the night of the shooting, and his lack of a substantial prior criminal record, are mitigating factors that we should consider in his favor. We have already concluded that the evidence did not require a manslaughter *instruction.* We have considered *his* other arguments and conducted our own review of the entire proceedings. We are not convinced that the verdict is unjustly severe, and we decline to exercise our extraordinary power under G. L. c. 278, § 33E.

*Judgment affirmed.*

---

killing herself had not been uttered, nor did they hear any sounds of a struggle or statements of the defendant attempting to gain possession of the gun.