Commonwealth *v.* Carney.

## COMMONWEALTH *vs.* AARON CARNEY.

Bristol. May 5, 2015. - July 20, 2015.

Present: GANTS, C.J., SPINA, CORDY, BOTSFORD, DUFFLY, LENK, & HINES, JJ.

*Homicide. Evidence,* Photograph, Relevancy and materiality, Firearm. *Practice, Criminal,* Capital case, Argument by prosecutor.

At a murder trial, the judge did not abuse his discretion in admitting in evidence an autopsy photograph of the victim's gunshot wound, where the photograph was relevant to the question of deliberate premeditation and to the question of accident (which trial counsel raised in his opening statement), where the gruesome aspects of the wound were minimized by the indirect angle from which the photograph was taken, and where the judge took further precautions to mitigate the potential for prejudice. [255-256]

At a murder trial, the judge did not err in admitting in evidence a BB gun and some ammunition (items unrelated to the killing) that were recovered from a closet used only by the defendant, where the evidence was admissible to show that the defendant had access to or knowledge of firearms and ammunition, a matter of particular relevance in the instant case, given that the defendant had indicated that accident would be an issue. [256]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the prosecutor's closing argument, where, although the prosecutor began by improperly inviting the jury to put themselves in the mind of the victim and thus to render a verdict based on emotion and sympathy for the victim rather than on a reasoned judgment based on the evidence at trial, this portion was just a brief segment of the over-all closing argument and was not a recurring theme, the main section of the argument was based on a highly detailed and proper analysis of the evidence and was well reasoned, the judge instructed that opening and closing arguments were not evidence, and the case against the defendant was overwhelming [257-258]; further, the prosecutor's reference to the defendant's getting a shotgun ready while he was upstairs was a reasonable and possible inference from the evidence [258]; finally, in the circumstances of the case, the prosecutor did not offend principles of proper argument through of his use of the pronoun "I" [258-259].

INDICTMENT found and returned in the Superior Court Department on December 11, 2009.

The case was tried before *Robert J. Kane,* J.

*Alan Jay Black* for the defendant.

*Tara L. Blackman,* Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of deliberately premeditated murder. On appeal he asserts error in the admission in evidence of (1) an autopsy photograph, and (2) a BB rifle together with ammunition that were unrelated to the killing. He also argues that the prosecutor's closing argument was improper. We affirm the conviction and decline the defendant's request for relief under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of particular issues. The defendant and Kenneth Fontaine became friends at sometime around 2005. Kenneth lived with his mother, Elizabeth Fontaine, the victim. Elizabeth was a registered nurse. She had significant issues with her health, including obesity. Kenneth assisted his mother with some of her needs. Kenneth and his mother purchased a single-family house in Attleboro during 2007. Because of her health and limited mobility, Elizabeth converted the first-floor living room into her bedroom. They took in boarders to help with their finances. The defendant was one such boarder. His rent was $400 per month. Kenneth and the boarders had bedrooms on the second and third floors. There also was a bedroom on the third floor that the boarders used for storage. Kenneth did not use that room.

During 2008, some of Elizabeth's medication began to disappear. Kenneth and Elizabeth believed it was taken by one of the other boarders, so they evicted him. Kenneth also discovered that an old shotgun he had kept in his closet was missing. He assumed it had been stolen by the same boarder who he thought had taken his mother's medication. Kenneth had discussed these losses with the defendant, but he did not suspect the defendant of taking them.

At one point, the defendant's employment situation changed and he fell behind in his rent. The arrearage was about $8,000 as of October, 2009. Nevertheless, the defendant and Elizabeth maintained a very good relationship. The defendant had told Kenneth at times that he did not understand how Kenneth could be so good to his mother, as her health problems seemed so burdensome. Kenneth typically paid for the defendant's food and cellular telephone bill, and he gave the defendant money for miscellaneous expenses such as cigarettes. He did this because he valued the defendant's friendship. Kenneth would sometimes use Elizabeth's prescription pain medication for migraine headaches, with her approval. What Elizabeth did not know was that Kenneth

also gave the defendant some of her Oxycontin pills on a regular basis.

In the fall of 2009, the defendant told Kenneth that he wanted to end his dependence on pain medication. He tried to stop taking them, but the withdrawal symptoms were intolerable. Kenneth gave the defendant two Oxycontin pills per day on weekends, and Vicodin once or twice a week to ease the defendant's withdrawal symptoms and enable him to function at his part-time job. During that period, the defendant became depressed over his employment situation, his indebtedness to Kenneth and Elizabeth, and the fact that he did not own a car.

On Friday, October 2, Kenneth and a friend drove in the friend's vehicle to New Hampshire. Kenneth left his own vehicle for the defendant to use. In the second-floor living room, Kenneth had left the defendant two or four Oxycontin pills for the weekend. The defendant visited a friend, Gerald Knight, Sunday evening, October 4. Knight did not see the defendant taking any prescription pills, but they may have smoked marijuana. Late that evening, the defendant retrieved the shotgun he had stolen from Kenneth. He had "sawed off" a portion of the barrel.[1] He went downstairs with the shotgun and had some conversation with Elizabeth. He aimed the shotgun at her and pulled the trigger. The blast caused multiple fractures to the right side of her skull and caused injuries to her brain. She died from these injuries.

The defendant wrote a note to Kenneth explaining what he had done. He said he did it because "[i]t was the only going away present I could think of that would improve your life. . . . Without the two of us in your life dragging you down, things can get a lot better for you if you let them. . . . You deserve to be freed of these burdens, and I am only trying to help you with that. . . . I'm sorry for the pain I caused you."

The defendant contemplated suicide, but was unable to follow through. He drove to Knight's home, arriving shortly after noon on Monday, October 5. He described for Knight what he had done. The defendant did not mention anything about having taken drugs or having been under the influence; he did not mention what he and Elizabeth had discussed; and he did not say why he had killed her. The defendant turned himself in to police. He telephoned Kenneth to apologize and said he did it with a shot-

---

[1]The record reflects that the length of the resulting barrel of the shotgun is sixteen inches. The defendant was not charged with possession of a sawed-off shotgun. See G. L. c. 269, § 10 (c).

gun. When Kenneth asked why he did it, he said he did not remember.

2. *Autopsy photograph.* The defendant argues that the judge abused his discretion by admitting in evidence an inflammatory autopsy photograph of Elizabeth's gunshot wound. The defendant objected to the ruling, so our review is under the prejudicial error standard. See *Commonwealth* v. *Flebotte,* 417 Mass. 348, 353 (1994). "The question whether the inflammatory quality of a photograph outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge." *Commonwealth* v. *Pena,* 455 Mass. 1, 12 (2009), quoting *Commonwealth* v. *DeSouza,* 428 Mas. 667, 670 (1999). A defendant bears a "heavy burden of demonstrating an abuse of that discretion." *Commonwealth* v. *Berry,* 420 Mass. 95, 108 (1995), quoting *Commonwealth* v. *Gallagher,* 408 Mass. 510, 519 (1990). See Mass. G. Evid. § 403 (2015) (relevant evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice). Photographs depicting a fatal wound generally are admissible on the issue of deliberate premeditation. See *Commonwealth* v. *Haith,* 452 Mass. 409, 415 (2008); *Commonwealth* v. *Berry, supra.*

The photograph was relevant to the question of deliberate premeditation. Elizabeth was found lying on her back with her legs off the side of the bed. Her feet were touching a short step she used to get in and out of bed. There was shotgun damage to the headboard of her bed. The jury could have found that the defendant aimed the shotgun at Elizabeth, as he had told Knight, and shot her while she was sitting on the side of her bed. The photograph was consistent with the other physical evidence, the testimony, and the Commonwealth's theory of deliberate premeditation. In addition, the photograph was relevant to the question of accident, which trial counsel raised in his opening statement. Trial counsel indicated in his opening that the gun discharged accidentally when Elizabeth reached for the barrel of the gun and the defendant tripped over a cat.[2] The photograph, the position of Elizabeth's body on her bed after the shooting, and the location of the shotgun damage to the headboard were inconsistent with the defendant's explanation of accident as put forth by

---

[2]The jury could have accepted the testimony of a firearms expert who tested the gun and determined that it did not malfunction and would not discharge if it were dropped or otherwise struck against an object.

trial counsel in his opening.[3]

The gruesome aspects of Elizabeth's head wound were minimized by the indirect angle from which the photograph was taken relative to the wound. The photograph was of Elizabeth's face, and depicted only the edge of the wound on the right side of her head. The judge took further precautions to mitigate the potential for prejudice by not allowing the photograph to be handled by the jury, by segregating it from the other exhibits, and by instructing the jury at the time the photograph was admitted not to be swayed by emotions. See *Commonwealth* v. *Allison*, 434 Mass. 670, 684 n.11 (2011), citing *DeSouza*, 428 Mass. at 670. There was no abuse of discretion in the admission of the autopsy photograph.

3. *BB gun and ammunition.* The defendant asserts error in the admission in evidence of a BB gun and some ammunition that were recovered from a third-floor closet used only by him. The items were unrelated to the killing. The judge instructed the jury at the time the items were admitted and again in his final instructions that if the Commonwealth proved that they belonged to the defendant, the jury could consider them solely on the question of the defendant's capacity to use the shotgun that caused Elizabeth's death. The defendant objected to the admission of this evidence, so we review under the prejudicial error standard. *Flebotte*, 417 Mass. at 353.

A judge has discretion to admit such evidence to show that the defendant had access to or knowledge of firearms and ammunition. See *Commonwealth* v. *McGee*, 467 Mass. 141, 157 (2014), and cases cited. This is particularly relevant here, where the defendant had indicated that accident would be an issue. The defendant's reliance on *Commonwealth* v. *Toro*, 395 Mass. 354, 356-357 (1985), is misplaced. In *Toro*, the defendant claimed he did not do the shooting. *Id.* at 355. Here, the defendant made no such claim, and the question of his familiarity with guns was relevant to his claim of accident. There was no abuse of discretion in the admission of these items.

---

[3]After the close of the Commonwealth's case, the defendant decided not to testify. The judge conducted a colloquy with the defendant and determined that the defendant voluntarily waived his right to testify. In the course of the colloquy the defendant said he understood that without his testimony there would be no basis to put the question of accident before the jury. In closing argument, trial counsel argued that Kenneth had manipulated the defendant by plying him with drugs, that the defendant was confused at the time of the killing, and that there was no evidence of premeditation.

4. *Prosecutor's closing argument.* The defendant contends that the prosecutor deprived him of a fair trial by making improper closing argument in several respects. There was no objection, so we review to determine if any error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

The prosecutor began his closing argument by inviting the jury to put themselves in the mind of the victim. He asked them to speculate what Elizabeth would have been thinking at the point in time when the defendant aimed the shotgun at her. The prosecutor continued:

> "Why would a man who was given so much from that family, and specifically by Kenneth Fontaine, who was given everything for a period of time, everything he chose to take, why would he do what he did? She must have asked that to herself in those moments before he shot and killed her.

> "And he didn't give her the opportunity to do the things that he had the opportunity to do. You heard that he told Gerald Knight that after he killed Mrs. Fontaine, he had the opportunity to go say goodbye to those he wanted to say goodbye to before he contemplated suicide that he could not commit. He didn't give her that chance. Instead he shot and killed her and violently brought her life to an end. She didn't get to know why."

The Commonwealth concedes, correctly so, that this was an improper appeal to the jury "to render a verdict based on emotion and sympathy for the victim rather than on a reasoned judgment based on the evidence at trial." See *Commonwealth* v. *Santiago*, 425 Mass. 491, 494 (1997). In addition, the prosecutor invited the jury to speculate about matters that were not in evidence. The record reflects that the defendant and Elizabeth did have conversation just before he shot her, but the record is silent about the details of that conversation. As such, the argument that Elizabeth did not know why he was about to kill her has no basis in the evidence, and was improper. See *Commonwealth* v. *Coren*, 437 Mass. 723, 732 (2002). Moreover, Elizabeth's state of mind was irrelevant in the circumstances, where the jury were not instructed on the theory of murder with extreme atrocity or cruelty, see *Commonwealth* v. *Raymond*, 424 Mass. 382, 389-390 (1997), and where her state of mind shed no light on whether the defendant had a motive to kill her. See *Commonwealth* v. *Qualls*, 425 Mass.

163, 169 (1997), *S.C.*, 440 Mass. 576 (2003). Finally, the prosecutor's closing argument improperly encouraged the jury to convict the defendant for being an ingrate.

The defendant has not shown, however, that the introductory portion of the prosecutor's closing argument created a substantial likelihood of a miscarriage of justice. It was just a brief segment of the over-all closing argument, and it was not a recurring theme. Contrast *Santiago, supra* at 494-495. The main section of the prosecutor's argument was based on a highly detailed and proper analysis of the evidence, and it was well reasoned. The judge's final instructions directed the jury to decide the case without emotion or sympathy, and he told them to base their verdict on the evidence. The judge instructed that opening statements and closing arguments of the lawyers were not evidence. The case against the defendant was overwhelming. In balance, the impropriety in the prosecutor's closing argument does not require a new trial. See *Commonwealth* v. *Bizanowicz*, 459 Mass. 400, 420-421 (2011).

The defendant next argues that the prosecutor argued facts not in evidence when he said the defendant was "getting that gun ready . . . while he was upstairs." There was no direct evidence of this, but it was a permissible inference to ask the jury to draw. There was evidence that a box of shotgun shells matching the type used to shoot Elizabeth had been seized from the defendant's bed. The jury could have inferred that the defendant loaded the gun shortly before going downstairs. The defendant told Knight that he brought the shotgun downstairs, aimed it at Elizabeth, and pulled the trigger. Although the inference that the prosecutor had asked the jury to draw was not the only inference that could be drawn from the evidence, it was both a reasonable and a possible inference. As such, it was permissible, and one that the jury could draw if they so decided. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 452-453 (1993).

The final claim of misconduct that the defendant advances is the prosecutor's alleged expression of personal opinion. We are satisfied that the prosecutor did not offend principles of proper argument through his use of the pronoun "I." "Merely using a 'first person pronoun does not interject personal belief into a statement.' " *Commonwealth* v. *Espada*, 450 Mass. 687, 699 (2008), quoting *Commonwealth* v. *Mamay*, 407 Mass. 412, 424 (1990). The prosecutor did not suggest that he had personal knowledge of the defendant's guilt. He merely summed up, accurately, the Commonwealth's case. See *Commonwealth* v.

*Stone*, 366 Mass. 506, 516 n.4 (1974).

5. *Review under G. L. c. 278, § 33E.* We have reviewed the briefs and the entire record and see no reason to order a new trial or reduce the degree of guilt.

*Judgment affirmed.*